UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------X
ROBERT TURSI,

                  Plaintiff,              **MEMORANDUM & ORDER**

    -against-

                                                           13-CV-4756 (SLT) (VMS)

UNITED STATES OF AMERICA,

                  Defendant.
------------------------------------------------------------X

**TOWNES, United States District Judge:**

        Plaintiff Robert Tursi moves under Federal Rule of Civil Procedure 15 and Section 2675(b) of the Federal Tort Claims Act ("FTCA") to increase his claim for damages from $150,000 to $2 million on the grounds that his knee replacement surgery was "newly discovered evidence not reasonably discoverable at the time of presenting the claim to the federal agency ...." (Robert B. Steinberg Affir. in Support of Mot. ("Steinberg Affir.") 1, ECF No. 46.) For the reasons set forth below, Plaintiff's motion is denied.

## MEDICAL HISTORY AND MEDICAL OPINIONS

        Plaintiff alleges that on August 22, 2011, he "was caused to trip and fall as a result of a dangerous, hazardous condition at the Brooklyn Campus of the Veterans Affairs Harbor Healthcare System, located at 800 Poly Place, Building 14, Brooklyn, NY 11209, by and through the negligence of Defendant." (Compl. ¶ 1, ECF No. 1.) Plaintiff went to the emergency room that day complaining of "pain in the right knee after a fall this am in the hospital." (Steinberg Affir., Ex. K.) The x-rays of his knee revealed "[d]egenerative change in the knee with mild effusion[1] and chondrocalcinosis[.]" *Id.* Three days later, on August 25, 2011, an MRI of his

---

[1] "Knee effusion, colloquially known as water on the knee, occurs when excess fluid accumulates in or around the knee joint. There are many common causes for the swelling, including arthritis, injury to the ligaments or meniscus, or when fluid collects in the bursa." http://www.medicalnewstoday.com/articles/187908.php

right knee revealed "medial compartment osteoarthritis" and that the "medial meniscus is torn." (*Id.* at Ex. L.) On September 8, 2011, Plaintiff consulted with orthopedic surgeons who noted Plaintiff's "[c]omplicated medical history needing a triple bypass for heart and history of hepatitis C for Liver, end stage liver disease[,]" that the "[p]ain did not improve on ice and elevation or with a brace but effusion decreased[,]" that "xrays with moderate arthritis[,]" and that the "MRI brought in from home – medial meniscal tear, parrot beak/flap tear in the body into the posterior horn[.]" (*Id.* at Ex. M.) The orthopedic surgeons also noted that "[d]ue to poor medical status at this point, surgery is not an option. We will start conservative management at this time." *Id.* The doctors further noted that

> -physical therapy not an option for patient as he would like the meniscal tear removed
> -nsaids not an option due to liver problems
> -ice and home exercise program at this time
> -cont knee brace
> -rtc prn when medically optimized
>
> ****
>
> 09/08/2011 ADDENDUM
> The pt is refusing trial of PT at this point.

*Id.* Consequently, just a few days after the accident, Plaintiff knew that he needed but could not receive surgery for his right knee.

Dr. Brandon, Plaintiff's treating orthopedic surgeon from 2011 through at least 2014, provided an expert opinion on August 22, 2014. (*Id.* at Ex. N.) Dr. Brandon's opinion did not address whether the knee replacement surgery was foreseeable at any time but rather focused on causation. Dr. Brandon opined as follows:

> In summation the patient sustained an injury to his right knee as a result of a fall on a raised door frame at the VA Hospital on or about August 22, 2011. He did not have any pain prior to this injury and this injury likely caused and/or exacerbated arthritic changes in his knee that resulted in him requiring 2 surgeries

2

including a total knee replacement. This was also made more complicated with
an increased risk for mortality and morbidity due to his extensive medical history
including coronary artery disease with a 4 vessel CABG and hepatocellular
carcinoma. The patient was aware that total knee replacements do not last forever
and often will require revision surgery which is much more invasive and has
greater mortality and morbidity risk, he may require this in the future. The patient
also had a significantly increased risk of developing an infection in a total knee
replacement which could result in further surgeries such as removal of the implant
and possible antibiotic spacer replacement. He required an extensive course of
physical therapy to return to a functional lifestyle really [*sic*] do activities of daily
living with minimal discomfort. His prognosis is good but he had to go through
extensive painful treatment to get to this point.

(*Id.* at 7-8.) Dr. Brandon also outlined his treatment findings for the years 2011 to 2014. He noted that "Plaintiff stated that he did not have any right knee pain prior to this injury." (*Id.* at 1.) Dr. Brandon opined that Plaintiff's 2011 MRI "showed a torn medial meniscus, ... some chondral defects in the medial meniscus, ...." (*Id.*) "The impression was that the patient had a torn medial meniscus and osteoarthritis ... which was likely exacerbated by this injury when he tripped and fell." (*Id.*) Dr. Brandon "would have recommended arthroscopic ... procedure, but the patient could not consider surgery at the time because he had to undergo a coronary artery bypass graft for vessel disease which he was recovering from and he subsequently was diagnosed with liver carcinoma and was awaiting a liver transplant. He was not medically fit to consider elective knee surgery at that time." (*Id.*) Dr. Brandon further noted that Plaintiff's knee was not responding to cortisone injections or "physical therapy exercises." (*Id.*)

The doctor then noted that Plaintiff's January 23, 2013 x-rays showed "some preservation of joint space. It was not bone-on-bone arthritis but he did have genu varum alignment.[2] His exam was unchanged and I recommended right knee arthroscopic partial medial meniscectomy

---

[2] "Genu varum (also called bow-leggedness, bandiness, bandy-leg, and tibia vara), is a physical deformity marked by (outward) bowing of the lower leg in relation to the thigh, giving the appearance of an archer's bow. Usually medial angulation of both femur and tibia is involved." https://en.wikipedia.org/wiki/Genu_varum

3

possible microfracture procedure." (*Id.* at 2.) Although the arthroscopic surgery was scheduled for April 12, 2013, it was "delayed until June 3, 2013" for other medical reasons. (*Id.*)

Plaintiff testified at his deposition that Dr. Brandon's prognosis for his recovery after the arthroscopic surgery was essentially wait and see:

> Q. So what was the treatment that Dr. Brandon recommended?
>
> A. He told me he would go in and do a laparoscopic, would repair that and we will see from there, he will scrape the bone, get the arthritis off, I said okay.

(Decl. of AUSA Jolie Apicella in Supp. of Def.'s Opp. to Pl.'s Mot. to Increase his Claim for Damages and to Amend the *Ad Damnum*, Ex. A at 64:6-12.)

After the arthroscopic surgery on June 3, 2013, Dr. Brandon treated Plaintiff monthly for follow-up care. (Steinberg Affir., Ex. N.) On September 11, 2013, Dr. Brandon noted that Plaintiff reported "persistent knee pain" and opined that Plaintiff's x-rays showed that "the arthritis in the tibiofemoral joint had progressed. At this time I discussed the option of total knee replacement and he informed me that he was awaiting a liver transplant and would require further medical treatment for his appendiceal carcinoma. He could consider a knee replacement." (*Id.* at 4.) A few months later, on January 30, 2014, Dr. Brandon opined that Plaintiff's pain had worsened and that he "was losing ... range of motion compared to his previous exam." (*Id.*) Plaintiff "was informed that he now has severe almost bone-on-bone medical compartment arthritis and significant patellofemoral compartment arthritis which has been refractory [resistant] to conservative treatment and arthroscopy. I recommended right total knee replacement and he was in agreement with the treatment plan." (*Id.*) Although the second surgery was scheduled for February 28, it was rescheduled for other medical reasons. (*Id.* at 5.)

Plaintiff underwent total knee replacement surgery on April 11, 2014. (*Id.*) Dr. Brandon and one of his associates performed the surgery. (*Id.* at 6.)

Defendant presented its own expert orthopedic surgeon, Dr. Pae. After examining Plaintiff and reviewing Plaintiff's medical records as well as Dr. Brandon's expert medical report, Dr. Pae provided his expert report on September 23, 2014. (Steinberg Affir., Ex. P.) Like Dr. Brandon, Dr. Pae's opinion focused primarily on causation rather than foreseeability. Dr. Pae opined that: "[w]ithin reasonable medical certainty the worsening of Mr. Tursi's right knee symptoms after the knee arthroscopy is due to his underlying severe osteoarthritis which progressed over the two years after the injury. Within reasonable medical certainty, his medial meniscus tear was not the primary reason for worsening of his arthritis symptoms. Therefore, it is with reasonable medical certainty that the need for his right total knee replacement was not from the fall, but rather from progression of the underlying advanced osteoarthritis of the knee which he had before his fall." (*Id.* at Four.) Accordingly, both experts agree that Plaintiff's accident exacerbated his pre-existing osteoarthritis which led to the arthroscopic and knee replacement surgeries.

Dr. Pae opined that the August 25, 2011 MRI revealed "a radical or 'parrot' tear[,]" and that "[t]his is more commonly seen in acute traumatic injuries, but can in some cases, be seen in patients with osteoarthritis. He had osteoarthritis of his right knee affecting the medial compartment and the patellofemoral articulation as could be seen on his x-rays taken on 8/22/2011 [the day after the accident] (Document 4) as well as the MRI of his knee (Document 1).... Within reasonable medical certainty his right knee medial meniscal tear could be caused from his fall. Therefore, his pain and problems walking immediately afterwards could be attributed to the fall." (*Id.* at Three.)

Dr. Pae further opined that Plaintiff "had severe preexisting significant arthritis of his right knee.... Dr. Brandon noted on his operative report for the knee arthroscopy and in his expert medical report that he had ... Grade 3 ... and Grade 4 defects" of the type "indicating advanced osteoarthritis." (*Id.*) Dr. Pae also opined that "[t]here is very limited scientific data about what are risk factors for progression of knee arthritis. Dr. Brandon took x-rays 9/11/2013 which showed genu varum alignment with joint space narrowing in the medial compartment which was now bone on bone and had progressed since the previous x-rays (p.4 Document 7). Although this clearly indicates objective progression of his arthritis (i.e. increased cartilage loss) from x-rays taken on 1/23/2013, causation of the progression cannot be stated with any scientific certainty given the current state of the literature. Advanced arthritis in essentially all cases will progress over time." (*Id.* at Four.)

In a Declaration dated April 17, 2015, Dr. Pae did address the issue of foreseeability of the knee replacement surgery. He opined that "considering the severity of degree of Mr. Tursi's pre-existing degenerative osteoarthritis and his age, it is not surprising that he required a total knee replacement[:]"

> 8. The x-rays taken on the day of his fall, August 22, 2011, show pre-existing degenerative osteoarthritis with osteophyte formation of Mr. Tursi's right knee.
>
> 9. The MRI films taken on August 25, 2011 also show pre-existing degenerative osteoarthritis of Mr. Tursi's right knee with areas of complete loss of cartilage on the medial femoral condyle and near complete loss of cartilage from the patellofemoral articulation.
>
> 12. Based on my examination of these objective radiographic films, I found that, as of the time of Mr. Tursi's August 2011 fall, his osteoarthritis was already significant and pre-existing.
>
> 13. From the initial x-rays and MRI in August 2011, even if the fall never had happened, based on Mr. Tursi's pre-existing degenerative osteoarthritis, a total knee replacement was within the scope of Mr. Tursi's worst case prognosis. His eventual knee replacement surgery is therefore not surprising nor unforeseen.

6

14. On page 7 of Plaintiff's Motion, it states that 'Dr. Brandon found more damage than had shown up on previous diagnostic testing.' It then goes on to list full and high grade partial cartilage loss ... These cartilage defects could have been predicted by the August 2011 knee MRI. On several images complete or near complete cartilage loss can been [sic] seen in the areas. Thus the statement, 'Neither Dr. Brandon nor the plaintiff could know this before surgery' is not the case given the 2011 knee MRI. If Mr. Tursi only suffered an isolated medial meniscus tear, and did not have any existing arthritis, after his arthroscopic surgery one would have expected near complete resolution of symptoms in approximately four to six weeks.

15. However, considering the severity of degree of Mr. Tursi's pre-existing degenerative osteoarthritis and his age, it is not surprising that he required a total knee replacement. Walking long distances such as he did after his arthroscopic surgery, can worsen arthritis symptoms. It is not unanticipated that he required a total knee replacement.

(Decl. of Robert Pae, M.D.)

## HISTORY OF ADMINISTRATIVE AND LITIGATION PROCEEDINGS

On March 8, 2013, Plaintiff filed an administrative claim with the Department of Veterans Affairs ("Veterans Affairs") seeking $150,000 in damages under the FTCA. (Compl. ¶ 6; Steinberg Affir., Ex. A.) Plaintiff described his "injury" as a "torn meniscus of the right knee requiring surgery." (Steinberg Affir. Ex. A.) Plaintiff did not mention his osteoarthritis. Plaintiff filed his administrative claim almost two years after he knew that he needed arthroscopic surgery due to either the torn meniscus or his osteoarthritis or both, but which had to be delayed because of his other pre-existing medical conditions. On May 29, 2013, Veterans Affairs denied Plaintiff's claim. (Steinberg Affir. Ex. B.)

On August 22, 2013, almost three months after Plaintiff's arthroscopic surgery, Plaintiff filed the instant lawsuit under the FTCA alleging that Defendant's negligence led to his August 22, 2011 accident and seeking, *inter alia*, "general" and "specific damages according to proof[.]" (Compl. at Prayer for Relief.) Plaintiff did not specify his injuries in the Complaint. On July 1,

2014, almost two months after Plaintiff's knee replacement surgery on April 11, 2014, Plaintiff filed an amended administrative claim with Veterans Affairs seeking to increase his claimed damages up to $2 million. (Steinberg Affir. Ex. E.) Plaintiff described his "injury" as:

> Mr. Tursi sustained severe and permanent personal injuries, including but not limited to: torn meniscus of the right knee requiring multiple surgeries, including but not limited to an arthroscopic partial medial meniscectomy, right knee arthroscopic chondroplasty of medial femoral condyle, right knee arthroscopic partial synovectomy and injection procedure major joint bursa of the right knee, as well as a subsequent total knee replacement.

(*Id.*) Plaintiff attached two medical reports from Dr. Brandon, one dated June 3, 2013, the day of the arthroscopic surgery, and another dated April 11, 2014, the day of the knee replacement surgery. (*Id.*) On July 10, 2014, Veterans Affairs denied Plaintiff's request to increase his damages claim on the grounds that: his request was untimely for failure to seek the increase before "the final decision by" Veterans Affairs; since "the veteran suffered a torn meniscus in his right knee which required surgery, thus there is a failure to satisfy the requirements for an exception to ... 2675(b), since it was reasonably foreseeable and anticipated that the plaintiff would require surgery[;]" and "assuming *arguendo* that a valid amended claim was filed, reference to an incident in August 2011 would make the claim untimely." (Steinberg Affir. Ex. F.)

On February 17, 2015, after the close of discovery (ECF No. 26), Plaintiff moved under Federal Rule of Civil Procedure 15(a) and 28 U.S.C. § 2675(b) to increase his claim for damages from $150,000 to $2 million based on "newly discovered evidence not reasonably discoverable at the time of presenting the claim to" Veterans Affairs "and/or upon allegation and proof of intervening facts relating to the amount of the claim." (Steinberg Affir. 3.) Defendant has opposed the motion on the grounds that "the alleged newly discovered and intervening fact of undergoing total knee surgery was well within the scope of a reasonably foreseeable prognosis

8

based on Plaintiff's initial x-ray and MRI and his doctor's initial consultation[,]" and because "policy justifications militate against an increase of the *ad damnum* in this case." (Opp. to Pl.'s Mot. to Increase his Claim for Damages and to Amend the *Ad Damnum* 1).

## DISCUSSION

### I. STANDARD OF REVIEW

"As a jurisdictional prerequisite to a suit under the FTCA an administrative claim must be filed with the appropriate federal agency before an action may be commenced against the United States." *O'Rourke v. Eastern Air Lines, Inc.*, 730 F.2d 842, 855 (2d Cir. 1984) (citing 28 U.S.C. § 2675(a) (abrogated on other grounds)). Under § 2675(b) of the FTCA, a claim for damages filed in federal court may not exceed the amount sought in the underlying administrative claim, except "where the increased amount is based upon newly discovered evidence not reasonably discoverable at the time of presenting the claim to the federal agency, or upon allegation and proof of intervening facts, relating to the amount of the claim." 28 U.S.C. § 2675(b). The burden of proof is on plaintiff to demonstrate that he meets either of these exceptions. *Malmberg v. United States*, 816 F.3d 185, 196 (2d Cir. 2016). When moving to amend a complaint under Rule 15(a) by seeking to increase the damages amount in an FTCA claim, it is "the narrower requirements of § 2675(b)" that govern, not "the liberal pleading requirements of Federal Rule of Civil Procedure 15 ...." *O'Rourke*, 730 F.3d at 856.

The Second Circuit has held that a motion to increase a party's damages claim is usually granted "only when an unexpected change occurred either in the law or in a medical diagnosis." *O'Rourke*, 730 F.2d at 856. "Generally the 'newly discovered evidence' exception is applied when a plaintiff is unaware of the medical extent of his injuries and expenses at the time his administrative complaint is filed[.]" *Barrett v. United States*, 622 F.Supp. 574, 594 (S.D.N.Y.

1985) (internal quotation marks and citations omitted), *aff'd*, 798 F.2d 565 (2d Cir. 1986). "The FTCA, as a statute waiving sovereign immunity, must be complied with strictly." *O'Rourke*, 730 F.2d at 856; *Allgeier v. United States*, 909 F.2d 869, 878 (6th Cir. 1990).

"Courts have noted that foreseeability is the key inquiry when determining what constitutes 'newly discovered evidence' and/or 'intervening facts.'" *Voccia v. United States*, 12-CV-5909, 2016 U.S. Dist. LEXIS 60780, at *3-*4 (E.D.N.Y. May 6, 2016) (citing *Malmberg v. United States*, No. 5:06-CV-1042, 2012 U.S. Dist. LEXIS 148296, at *1 (N.D.N.Y. Oct. 15, 2012) (citing *Lowry v. United States*, 958 F. Supp. 704, 710 (D. Mass. 1997)). "Thus, if the condition was reasonably foreseeable at the time the plaintiff filed his administrative claim, the court will not allow him to increase the *ad damnum* clause." *Id.* (citation omitted).

## II. PLAINTIFF HAS FAILED TO SHOW THAT THE KNEE REPLACEMENT SURGERY WAS AN UNEXPECTED CHANGE IN MEDICAL DIAGNOSIS OR AN INTERVENING FACT THAT AROSE AFTER HE FILED HIS ADMINISTRATIVE CLAIM

Plaintiff argues that "[n]either the plaintiff nor his doctors could know that he would need a knee replacement at the time he filed his claim when he had not even had arthroscopic surgery[,]" and that "although plaintiff did have some arthritis in his right knee, Mr. Tursi could not know that following the anticipated arthroscopic surgery, that his condition would deteriorate and he would need a total knee replacement and rehabilitation and also that surgery in the future would be necessary." (Steinberg Affir. 9 at ¶ 1.) Plaintiff is correct that he filed his administrative claim on March 8, 2013 (Compl. ¶ 6; Steinberg Affir., Ex. A), over three months before his arthroscopic surgery on June 3, 2013. (Steinberg Affir., Ex. N.) But Plaintiff's arguments concerning foreseeability of his knee replacement surgery are not supported by his own expert and treating orthopedic surgeon, Dr. Brandon.

10

Dr. Brandon provided no opinion on the issue of foreseeability; he opined only about causation: "this injury likely caused and/or exacerbated arthritic changes in his knee that resulted in him requiring 2 surgeries including a total knee replacement." (Steinberg Affir., Ex. N at 7.) Consequently, Dr. Brandon did not opine that the knee replacement surgery was an unexpected medical procedure. Nor did he opine that when he first examined Plaintiff after the injury or when he performed the arthroscopic surgery on June 3, 2013, that he did not anticipate additional surgeries. Dr. Brandon also did not opine that he expected a full recovery after the arthroscopic surgery. In fact, he told Plaintiff that he had a wait and see prognosis:

> Q. So what was the treatment that Dr. Brandon recommended?
>
> A. He told me he would go in and do a laparoscopic, would repair that and we will see from there, he will scrape the bone, get the arthritis off, I said okay.

(Decl. of AUSA Jolie Apicella in Supp. of Def.'s Opp. to Pl.'s Mot. to Increase his Claim for Damages and to Amend the *Ad Damnum*, Ex. A at 64:6-12.) Therefore, Dr. Brandon's opinion does not support Plaintiff's argument that Plaintiff's doctors could not have known that Plaintiff would need a knee replacement surgery at the time that he had filed his claim.

Defendant's expert, Dr. Pae, did opine on foreseeability by opining that "eventual knee replacement surgery is ... not surprising nor unforeseen" given Plaintiff's pre-existing osteoarthritis:

> 12. Based on my examination of these objective radiographic films, I found that, as of the time of Mr. Tursi's August 2011 fall, his osteoarthritis was already significant and pre-existing.
>
> 13. From the initial x-rays and MRI in August 2011, even if the fall never had happened, based on Mr. Tursi's pre-existing degenerative osteoarthritis, a total knee replacement was within the scope of Mr. Tursi's worst case prognosis.

(Decl. of Robert Pae, M.D.) Plaintiff argues that this portion of Dr. Pae's opinion "is just not borne out by the facts and medical records in this case. Never was this discussed nor does it

11

appear in any medical record." (Reply Affir. ¶ 13.) But Plaintiff does not dispute that he had pre-existing osteoarthritis in the same knee that he allegedly injured in the accident at issue in this case. Moreover, Plaintiff has not come forward with any expert or medical testimony from Dr. Brandon or anyone else to rebut Dr. Pae's opinion. Plaintiff has failed to meet his burden to show that the knee replacement surgery was an "unexpected change in medical diagnosis." *O'Rourke*, 730 F.2d at 856.

In *Lowry v. United States*, the court denied the plaintiff's motion seeking to increase her damages claim, in part because her treating physician's trial testimony indicated that the medical evidence that the plaintiff claimed was "newly discovered" was not an unexpected change in medical evidence. 958 F.Supp. 704, 720-21 (D. Mass. 1997). Here, there is a stronger case to deny Plaintiff's motion because Dr. Brandon has not even opined on the issue of foreseeability, specifically whether the knee replacement surgery was an unexpected change in medical diagnosis or reasonably foreseeable by the time that Plaintiff had filed his administrative claim. In *Voccia v. United States*, the Court held that "Plaintiff has failed to carry his burden of establishing that his traumatic brain injury diagnosis is newly discovered evidence that was not reasonably discoverable when he filed his Administrative Claim[,]" where the plaintiff offered no expert opinion to rebut the defendant's expert opinion that the plaintiff does not even have the injury that the plaintiff claimed was newly discovered. 2016 U.S. Dist. LEXIS 60780, at *8 (E.D.N.Y. May 6, 2016). This case is not like *Malmberg v. United States* where the Second Circuit found no clear error in the district court's decision to grant the plaintiff's request to increase damages where the plaintiff's treating physician testified at trial that "the extent of Malmberg's deterioration was *not foreseeable*" before the plaintiff had filed his administrative claim. 816 F.3d 185, 197 (2d Cir. 2016) (italics in original).

Plaintiff also argues that he "developed a new condition that was not, and could not have been, diagnosed at the time the FTCA claim was filed ...." (Steinberg Affir. 15.) Plaintiff fails to specify what the "new condition" is. Moreover, it was the worsening of a pre-existing condition, the osteoarthritis, not a new condition that led to Plaintiff's knee replacement surgery. Dr. Brandon's opinion supports this conclusion. Dr. Brandon had initially recommended the knee replacement surgery on September 11, 2013. (Steinberg Affir., Ex. N at 4.) By January 30, 2014, about four months after the arthroscopic surgery, Dr. Brandon told Plaintiff "that he now has severe almost bone-on-bone medical compartment arthritis and significant patellofemoral compartment arthritis which has been refractory [resistant] to conservative treatment and arthroscopy." (*Id.*) Consequently, Dr. Brandon again "recommended right total knee replacement ...." (*Id.*) Dr. Brandon's opinion, therefore, supports his conclusion that "this injury likely caused and/or exacerbated arthritic changes in his knee that resulted in him requiring 2 surgeries including a total knee replacement." (*Id.* at 7.) There is no new condition.

Despite conceding that the rulings in the Second Circuit are controlling in this jurisdiction, Plaintiff surveys the legal standards propounded by other jurisdictions in making § 2675(b) determinations. Nonetheless, the other jurisdictions' rulings are not inconsistent with rulings within the Second Circuit. *See e.g, Spivey v. United States*, 912 F.2d 80, 84 (4th Cir. 1990) (upholding district court's use of the legal standard of "*could not have been* diagnosed or included in the amended administrative claim ...") (italics in original); *Allgeier v. United States*, 909 F.2d 869, 878 (6th Cir. 1990) (interpreting an "intervening fact[]" under § 2675(b) to "require[e] an element of unforeseeability ...").

Plaintiff focuses particularly on the Eleventh and Fifth Circuits. Plaintiff refers to the Eleventh Circuit's "change of expectation" standard propounded in *Fraysier v. United States*, but

that case does not support Plaintiff's position here. 766 F.2d 478, 480 (11th Cir. 1985). The *Fraysier* Court held that "[t]he purpose of Section § 2675(b) undoubtedly is to limit claims on which there is only a change in valuation between the agency claim and the lawsuit." *Id.* Accordingly, that Court held that it would not deny a motion to increase a claim for damages in litigation from what was submitted to the federal agency simply because the costs had increased. The Fifth Circuit needs more, and it had more in *Fraysier*: "[t]he physical effect of the injury was apparently the same at the agency level as it was at trial. That those effects would remain permanent [however], was not known at the agency level." *Id.* And it could not have been known "at the agency level[,]" meaning when the plaintiff filed the administrative claim, because the plaintiff's treating physician initially told him that he did not suffer from the very condition that he was eventually diagnosed with and led to this permanent condition, and that nonetheless the "extensive medical evidence" at trial concerning the "unpredictable and complex" nature of this condition indicated that it would have made it difficult for the doctor to predict the plaintiff's chances for improvement "with any certainty at the time of filing ...." *Id.* at 481. Therefore, the plaintiff "should not be charged with knowing what the doctors could not tell him." *Id.*

No such facts are present in this case. Plaintiff does not dispute that he had pre-existing osteoarthritis. Nor does Dr. Brandon characterize the osteoarthritis as "unpredictable and complex" such that he could not have foreseen the possible need for a knee replacement surgery.

Moreover, in *Low v. United States*, the Fifth Circuit explicitly relied on the Second Circuit's ruling in *O'Rourke* to find that "the allegedly newly discovered evidence or intervening facts must not have been reasonably capable of detection at the time the administrative claim was filed." 795 F.2d 466, 470 (5th Cir. 1986). Thus, the Fifth Circuit's ruling is in line with that of the Second Circuit. The *Low* Court further held that "while courts do not charge a claimant with

knowing what the physicians could not tell him, ..., the information must [also] not have been discoverable through the exercise of reasonable diligence." *Id.*

Plaintiff also relies heavily on *Salas v. United States* where the Court found that "a reasonable person would not have foreseen the possibility of amputation, given the fact that plaintiff's prognosis after his first surgery was that he was expected to fully recover, be able to ambulate and could return to work full time." No. 12cv0337, 2013 U.S. Dist. LEXIS 170433, at *12 (S.D. Cal. 2013). But here, Dr. Brandon made no such prognosis after Plaintiff's arthroscopic surgery. Dr. Brandon's opinion makes no mention of his prognosis for Plaintiff's recovery. It is Plaintiff who testified during his deposition that Dr. Brandon told him that he would get the arthritis off during the arthroscopic surgery and "see from there ...." (Decl. of AUSA Jolie Apicella in Supp. of Def.'s Opp. to Pl.'s Mot. to Increase his Claim for Damages and to Amend the *Ad Damnum*, Ex. A at 64:6-12.) This is a far cry from the treating physician who told Salas that he expected a "full[] recover[y]" after Salas's first surgery. 2013 U.S. Dist. LEXIS 170433, at *12.

Relying on *Salas*, Plaintiff also contends that Plaintiff's "history of medical complications is an intervening fact that fits the FTCA exception allowing plaintiff to increase his claimed amount." (Affir. in Supp. of Mot. 15-6.) In *Salas*, however, the plaintiff had no preexisting medical conditions that delayed treatment. But here, Plaintiff's medical complications that delayed initial treatment on Plaintiff's knee – his heart and liver problems – were known to Plaintiff before the November 2011 accident; hence, they are not intervening facts that arose after Plaintiff filed his administrative claim. In fact, Plaintiff knew on September 8, 2011, just a few days after the accident on August 22, 2011, which was almost two years before he filed his administrative claim, that his pre-existing medical conditions would delay surgery on his knee:

15

"[d]ue to poor medical status at this point, surgery is not an option. We will start conservative management at this time." (Steinberg Affir., Ex. M.) Consequently, Plaintiff is wrong to argue that the instant case is "on all fours with the Salas case." (Steinberg Affir. 16.)

## CONCLUSION

For the reasons set forth above, Plaintiff's motion to increase his claim for damages is DENIED. (ECF No. 46.)

**SO ORDERED.**

s/SLT

/SANDRA L. TOWNES
United States District Judge

Dated: August 18, 2017
Brooklyn, New York

16